UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FEDERAL ENERGY REGULATORY    *
COMMISSION,    *
   *
    Petitioner,    *
   *
      v.    *
   *      Civil No. 15-30113-MGM
MAXIM POWER CORP., *et al.*,    *
   *
    Respondents.    *

MEMORANDUM AND ORDER REGARDING PROCEDURES APPLICABLE
TO FERC'S PETITION AND RESPONDENTS' MOTION TO DISMISS
(Dkt. No. 16)

July 21, 2016

MASTROIANNI, U.S.D.J.

## I.    INTRODUCTION

The Federal Energy Regulatory Commission ("FERC," the "Commission," or "Petitioner")

filed a petition for an order affirming its May 1, 2015 Order Assessing Civil Penalties (the "FERC

Order") against Maxim Power Corp.; Maxim Power (USA), Inc.; Maxim Power (USA) Holding

Company Inc.; Pawtucket Power Holding Company, LLC; Pittsfield Generating Company, LP

(collectively, "Maxim"); and an individual employee named Kyle Mitton (together with Maxim, the

"Respondents"). The FERC Order penalized Respondents for engaging in energy market

manipulation and for submitting false or misleading information, or omitting material information,

to FERC-approved regulatory entities in connection with an alleged scheme to obtain excessive

payments for energy supplied in the summer of 2010. The FERC Order called for a $5 million

penalty against Maxim and a $50,000 penalty against Mr. Mitton. As contemplated by the procedures

of the Federal Power Act ("FPA"), Respondents have elected not to pay the penalty, and FERC has

filed this petition to affirm its order. There are two claims asserted against Respondents. The first is

for violation of the anti-manipulation provisions of the FPA, 18 U.S.C. § 824v, and FERC's rules, 18 C.F.R. § 1c.2. The second is for violation of FERC's candor rule, 18 C.F.R. § 35.41(b).

This opinion first sets forth the relevant facts. It then discusses the issue of applicable procedures, which is the source of considerable dispute between the parties and is a matter of first impression. In short, the court concludes that this case is to be treated as an ordinary civil action requiring a trial *de novo*, but with limitations on the discovery process in order to promote an efficient resolution of the case. The opinion then addresses the substance of Respondents' motion to dismiss, which the court denies. Finally, the court sets forth procedural guidelines for the parties to follow.

## II.    FACTS

### A.    The New England Electricity Markets and the Relevant Entities

FERC is the federal administrative agency that regulates energy markets in the United States. ISO-NE is the FERC-regulated organization that operates New England's wholesale energy markets. (Dkt. No. 1, Pet. ¶ 2.) ISO-NE purchases electricity from generators and resells that electricity to consumers. (*Id.* ¶ 33.) ISO-NE operates two markets. In the day-ahead market, electricity is bought and sold one day prior to its delivery. In the real-time market, electricity is bought and sold on the same day as its delivery. (*Id.* ¶ 34.) ISO-NE typically purchases electricity from generators based on the lowest prices offered. The price at which ISO-NE purchases electricity is the market price. Sometimes, to ensure the reliability of the electric grid during periods of high demand, ISO-NE may require a generator to operate even though its offer was above the market price. (*Id.* ¶ 33.) This is known as "dispatching" the generator. To prevent dispatched generators from exploiting their market power, ISO-NE does not pay dispatched generators based on their offer prices. Instead, ISO-NE limits, or "mitigates," payments to dispatched generators to the cost of the fuel burned, plus 10%. (*Id.* ¶ 35.)

Maxim owns and operates a power plant in Pittsfield, Massachusetts. (*Id.* ¶¶ 29-30.) The Pittsfield plant can burn either oil or natural gas to generate electricity. The Pittsfield plant obtains natural gas through a pipeline connection with Tennessee Gas Pipeline Company ("TGP"). (*Id.* ¶ 31.) The Pittsfield plant has on-site storage for oil, but not for natural gas. During the relevant period, Mr. Mitton was a senior analyst at Maxim and often decided at what prices it would offer in to the day-ahead market. Managing daily fuel risk is a major part of the competitive and financial analysis for Maxim. (Dkt. No. 17, Respondents' Mem. Supp. Mot. to Dismiss ("Resp. Mem.") at 6.)

**B.    The Alleged Scheme and Misrepresentations**

July and August 2010 were particularly hot months in New England, leading to increased demand for electricity. (Pet. ¶ 37.) During the summer of 2010, natural gas was almost always a cheaper fuel source than oil for generators to acquire and burn. (*Id.* ¶ 31.) Given increased demand for natural gas, TGP issued pipeline restriction notices throughout the summer of 2010, constraining generators' ability to purchase natural gas. In July and August 2010, ISO-NE dispatched the Pittsfield plant on most days to help ensure grid reliability. (*Id.* ¶ 37.) Maxim's offers into ISO-NE's day-ahead market were due by 12:00 pm ET each day. (*Id.* ¶ 34.) Maxim's nominations to purchase gas from TGP were due by 12:30 pm ET each day. (Resp. Mem. at 7.) ISO-NE notified Maxim by 4:00 pm ET each day if it had received a commitment to operate the following day. (*Id.*)

In the summer of 2010, oil prices were about $175 per MWh (the standard unit for wholesale electricity), while natural gas prices were about $75/MWh. (Pet. ¶ 38.) This substantial difference of approximately $100/MWh meant that Maxim could obtain greater profits if it acquired and burned natural gas but was paid based on oil prices. At the same time, Maxim could suffer severe losses if it obtained and burned oil, but was paid based on natural gas prices. Whether Maxim's actions were fraudulent attempts to obtain greater profits or reasonable economic decisions to avoid severe losses is the crux of the parties' disagreement.

For 38 of the 45 days between July 5, 2010 and August 18, 2010, Maxim submitted day-ahead offers for the Pittsfield plant based on higher oil prices, rather than lower natural gas prices. On 22 of those 38 days, ISO-NE dispatched the Pittsfield plant and paid Maxim based on the oil prices offered, but the Pittsfield plant actually burned "all or nearly all" natural gas at a much lower cost. FERC alleges that, on 11 of these 22 days, Maxim had already contracted to purchase natural gas from TGP before the 12:00 pm deadline for submitting day-ahead offers. (*Id.* ¶ 37.) Maxim contends that, on all 22 of these days, ISO-NE increased the hours the Pittsfield plant was required to operate, and Maxim had to either purchase natural gas in the more expensive same-day market or burn more expensive oil in conjunction with natural gas. (Resp. Mem. at 10.)

Mr. Mitton played a substantial role in Maxim's price offers. (Pet. ¶¶ 32, 38.) FERC alleges Maxim knew it would obtain higher profits if the Pittsfield plant was dispatched and paid for more expensive oil while it actually burned cheaper natural gas, so long as it kept ISO-NE from learning which fuel it was actually burning. (*Id.* ¶¶ 39-40.) On July 15, 2010, John Angeli from ISO-NE left a voicemail for Mr. Mitton asking about the "offer price" for the Pittsfield plant. On July 16, 2010, Mr. Mitton responded with an email stating: "We have been offering the unit in conservatively on fuel oil due to the daily gas restrictions on [TGP]. I can provide you the restriction notices for your records if you like." (*Id.* ¶ 41.) That same day, ISO-NE requested the documentation that Mr. Mitton had mentioned. On July 19, 2010, copying his supervisor Eagle Kwok, Mr. Mitton emailed ISO-NE documentation showing the TGP restriction notices for July 2010. Mr. Mitton explained that the restrictions "have been a serious issue." (*Id.* ¶ 42.) He also explained that, because the Pittsfield plant would face "extremely severe" penalties if it burned gas it had not purchased, "to protect ourselves we have been offering in on fuel oil to control our risk exposure." (Resp. Mem. at 10.) He also asked if ISO-NE would like to be notified in the future when the Pittsfield plant is "offering on fuel oil due to gas pipeline restrictions." (Dkt. No. 18, Ex. F.)

On July 20, 2010, ISO-NE responded with a request to Maxim: "when you have a fuel issue please let us [know] so we can model the unit on the correct fuel." Mr. Mitton responded that Maxim would do so, and stated that "[a]s a heads up we are in on fuel oil again for tomorrow." (Pet. ¶ 43; Dkt. No. 30, Ex. L.) Later on the same day, Maxim manager Chris Devasahayam sent an internal email about market rules to Mr. Mitton and Mr. Kwok. He stated that ISO-NE has the power to mitigate offer prices that have a material effect on dispatch payments, and that ISO-NE must go through three steps of investigation. The first step is to "investigate reasons for the offer," and only "if they are not convinced" will ISO-NE proceed to the second and third steps, which involve testing the effects of offer prices on dispatch payments. The email stated that "if we can provide [ISO-NE] with the rationalization behind our pricing, it won't get to the 2nd or 3rd stages." It then listed reasons to explain Maxim's pricing, including difficulty obtaining gas during pipeline restrictions and the need for risk management. (Pet. ¶ 46; Dkt. No. 18, Ex. J.)

On August 16, 2010, Richard Dominguez from ISO-NE sent Maxim an email stating that, "[i]n our standard review process," the Pittsfield plant had violated the threshold screen for dispatch payments. The email asked Maxim to provide fuel burn data for most of the days in July 2010. (Pet. ¶ 47; Dkt. No. 18, Ex. I.) On August 18, 2010, according to Mr. Dominguez's call log, he had a phone conversation with Mr. Mitton. The log states that Mr. Mitton "was under the impression (wrongly) that the mere notification of 'potent[i]al' gas procurement [problems] and the offer of oil was sufficient and that no further review would be done by [ISO-NE]. I corrected his understanding and informed him that [ISO-NE] never indicated that the offer of oil and burning of gas was an acceptable behavior." (Pet. ¶ 46, Ex. 1.) On August 23, 2010, Mr. Kwok emailed ISO-NE the requested fuel burn data, which showed that the Pittsfield plant had been burning exclusively natural gas on all but two days. The email stated, "[d]espite the disparity in natural gas and fuel oil consumption, you must appreciate that we have been forth[coming] with [ISO-NE] under the

circumstances by which we have made our decision to offer Pittsfield's energy either using natural gas or fuel oil pricing." The email went on to request that ISO-NE "clarify and reaffirm that Pittsfield has acted reasonabl[y] in its desire to mitigate substantial fuel pricing disparities during times of natural gas pipeline restrictions that can directly impact Pittsfield's ability to procure natural gas." The email reiterated Maxim's position that its actions "were taken in good faith for legitimate risk management business reasons" and that Maxim would suffer severe losses if it offered natural gas prices and burned oil. (Pet. ¶ 47; Dkt. No. 18, Ex. I.)

ISO-NE mitigated Maxim's compensation by $2.99 million for this period to reflect the fuel that was actually burned, rather than the prices that were offered. (Pet. ¶¶ 10, 48.) Respondents point out that, if ISO-NE ever had reason to believe Maxim had violated market rules, it was required to refer Maxim to FERC, but it never did so. (Resp. Mem. at 11.)

### C. FERC's Investigation and Penalty Assessment

In 2013, during an unrelated investigation, FERC uncovered documents relating to Maxim's communications with ISO-NE in the summer of 2010 and started investigating these events. (Pet. ¶ 53.) FERC submitted document requests to Respondents and took depositions of multiple Maxim employees, including Mr. Mitton. (Resp. Mem. at 11.) Respondents were able to submit documents presenting facts and arguments in their defense, but they did not have the right to make any document requests, depose or cross-examine any witnesses, or put on their own witnesses. (Pet. ¶ 53; Resp. Mem. at 11.) On November 3, 2014, FERC publicly issued a notice of alleged violations of the anti-manipulation and candor rules for the summer of 2010 time period. (Pet. ¶ 55.) On November 5, 2014, FERC's enforcement staff privately notified Respondents that it was recommending enforcement proceedings against them. (*Id.* ¶ 57.)

On February 2, 2015, FERC issued an order to show cause and notice of proposed penalty against Respondents. (*Id.* ¶ 59.) This ended the investigative stage of the proceedings and began the

adjudicative stage. (Dkt. No. 45, Ex. D.) The FERC enforcement staff investigating this case, who were permitted to communicate with the Commissioners regarding the case during the investigative stage (*see id.*), did not advise the Commissioners during their deliberations at the adjudicative stage. (Pet. ¶ 61.) *See* 18 C.F.R. § 385.2202. On March 4, 2015, pursuant to 16 U.S.C. § 823b(d)(3), Respondents chose to forgo a proceeding before an administrative law judge and instead to have FERC issue a penalty if it found that Respondents had committed the alleged violations. (Pet. ¶ 60.)

On May 1, 2015, after reviewing the documentary and testimonial record, which was provided to Respondents (*see* Dkt. No. 44, FERC's Mem. on Procedures at 7), as well as briefs from the enforcement staff and Respondents, FERC's Commissioners issued an order finding Respondents had committed the alleged violations and imposing a penalty of $5 million for Maxim and $50,000 for Mr. Mitton. (Pet. ¶¶ 60, 62, 66, Ex. 1.) Three Commissioners voted in favor of the FERC Order, one dissented, and one was not part of the decision. (*Id.*, Ex. 1; Resp. Mem. at 12.) The FERC Order goes into considerable factual detail in support of its conclusion that Respondents engaged in market manipulation and made misrepresentations, or omitted material facts, in their communications with ISO-NE. Although ISO-NE has already retained the $2.99 million in excessive payments, FERC issued the penalties to deter future wrongdoing. In a written dissent, the dissenting Commissioner viewed Respondents' actions as reasonable business decisions made for legitimate economic and risk-avoidance purposes. (Pet., Ex. 1.)

D.    **FERC's Petition**

Pursuant to 16 U.S.C. § 823b(d)(3)(B), Respondents have not paid the penalties, requiring FERC to "institute an action in the appropriate district court of the United States for an order affirming the assessment of the civil penalt[ies]." After FERC filed this petition, Respondents filed a motion to dismiss, which seeks to frame the petition as a standard civil complaint and moves to dismiss it for failure to state a claim.

### III.    APPLICABLE PROCEDURES

The parties disagree regarding the procedures to be applied in this case. According to the statute, after issuing a notice of a proposed penalty and receiving notice of Respondents' election not to proceed before an administrative law judge, FERC "shall promptly assess such penalty, by order." 16 U.S.C. § 823b(d)(3)(A). If the penalty is not paid, then FERC "shall institute an action in the appropriate district court of the United States for an order affirming the assessment of the civil penalty." 16 U.S.C. § 823b(d)(3)(B). According to the statute, "[t]he court shall have authority to review *de novo* the law and the facts involved, and shall have jurisdiction to enter a judgment enforcing, modifying, and enforcing as so modified, or setting aside in whole or in [p]art" the penalty assessment. *Id.* Respondents take this language to mean the case should be treated as an ordinary civil action that is governed entirely by the Federal Rules of Civil Procedure and culminates in a jury trial. FERC insists this is not a typical civil action, and that the statute's directive of *de novo* review grants the court discretion and flexibility to craft the procedures needed to take a fresh look at the law and evidence without requiring a trial and the attendant procedures. In other words, while the parties agree that the standard of review is *de novo*, they disagree as to the procedures to be used in effecting this review.

### A.    The Governing Statute – FPA Section 31

The court must begin with the language of the statute. The FPA authorizes FERC to assess civil penalties for FPA violations "after notice and opportunity for public hearing" and directs FERC to "take into consideration the nature and seriousness of the violation, failure, or refusal and the efforts of the licensee to remedy the violation." 16 U.S.C. § 823b(a), (c). Before FERC may issue "an order assessing a civil penalty against any person," it must "provide to such person notice of the proposed penalty" and "inform such person of his opportunity to elect" the procedures of either Section 31(d)(2) or Section 31(d)(3) of the FPA. 16 U.S.C. § 823b(d)(1). Because Respondents were

given a choice between the two provisions, the court will review and compare both to analyze the distinctions. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

Section 31(d)(2) is the default option, and the court will refer to it as "Option 1." It reads in relevant part as follows:

> [FERC] shall assess the penalty, by order, after a determination of violation has been made on the record after an opportunity for an agency hearing pursuant to [5 U.S.C. § 554] before an administrative law judge . . . . Such assessment order shall include the administrative law judge's findings and the basis for such assessment. Any person against whom a penalty is assessed under this paragraph may . . . institute an action in the United States court of appeals for the appropriate judicial circuit for judicial review of such order . . . . The court shall have jurisdiction to enter a judgment affirming, modifying, or setting aside in whole or in [p]art, the order of [FERC], or the court may remand the proceeding to [FERC] for such further action as the court may direct.

16 U.S.C. § 823b(d)(2).

Section 31(d)(3) is the option Respondents chose to apply in this case, and the court will refer to it as "Option 2." It provides as follows with respect to the assessment of a civil penalty:

> [FERC] shall promptly assess such penalty, by order . . . . If the civil penalty has not been paid within 60 calendar days . . . [FERC] shall institute an action in the appropriate district court of the United States for an order affirming the assessment of the civil penalty. The court shall have authority to review *de novo* the law and the facts involved, and shall have jurisdiction to enter a judgment enforcing, modifying, and enforcing as so modified, or setting aside in whole or in [p]art such assessment.

16 U.S.C. § 823b(d)(3).

Both provisions require FERC to "assess" penalties "by order," but they differ in how they direct FERC to arrive at the penalty order. Option 1 tells FERC to make its determination "on the record after an opportunity for an agency hearing pursuant to [5 U.S.C. § 554] before an administrative law judge," and the assessment order must "include the administrative law judge's findings and the basis for such assessment." In contrast, Option 2 calls for FERC to "promptly assess" penalties "by order" and does not set out any required procedures for arriving at such order.

FERC has consistently interpreted Option 2 as not requiring any procedural protections prior to the penalty assessment, but it exercises its discretion to provide certain protections to avoid the perception of unfairness.

Once a penalty is assessed, the provisions differ on how it might be reviewed by courts. Option 1 permits a penalized party to institute an "action" in a circuit court of appeals for "judicial review" of the penalty order. In its judicial review, the circuit court may affirm, modify, or set aside the order, or remand for further administrative proceedings. The provision is silent regarding the standard of review to be applied. Under Option 2, the onus is on FERC to institute an "action" in a district court "for an order affirming the assessment of the civil penalty." The district court may enforce, modify, enforce as modified, or set aside the penalty order, but there is no option to remand for further proceedings. The statute specifies the standard of review under Option 2 by directing the district court to "review *de novo* the law and the facts involved."

Only Option 2 explicitly gives district courts the authority to engage in *de novo* review of law and fact. It is clear, as all parties point out, that *de novo* review means "a fresh, independent determination" that gives "no deference" to FERC's decision. *FERC v. MacDonald*, 862 F. Supp. 667, 672 (D.N.H. 1994). It is not clear, however, what procedures must be applied at the district court before arriving at this independent determination, and this is the root of the parties' disagreement regarding the procedures under Option 2. Respondents assert a district court is to take an active role in reviewing, and actually developing, the facts needed to make its determination as part of an ordinary civil action. FERC argues an order affirming a penalty assessment would only necessitate a review of whatever materials FERC relied on in making its assessment. Option 2 does not provide procedural protections or adversarial rights, but gives the district court jurisdiction over factual development and legal analysis, just as the administrative law judge would have when Option

1 applies. Inherent in this authority is the court's duty to provide procedural protections and an adversarial structure under Option 2.

Option 2 would not be fair to parties facing a penalty if it failed to provide due process rights during FERC's penalty assessment and did not provide for due process rights at a later district court review. Congress cannot have intended for one of the procedural options to be so unappealing and unfair. *Cf. Corley v. United States*, 556 U.S. 303, 314 (2009) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant."). FERC argues that a party might reasonably elect to apply Option 2—which it characterizes as "an adversarial proceeding before the Commission itself, followed by review in federal District Court," that "may not include additional factual development or live testimony"— because it "is likely to be less costly and offer a standard of review in federal court that is more favorable to respondents." (FERC's Mem. on Procedures at 23.) But this presupposes the party obtains an adversarial hearing before FERC, which FERC itself says is not required by the FPA and is within FERC's discretion to grant (or presumably deny). Even assuming a party could be certain that FERC would grant what it believed to be procedural rights, under FERC's reading of the FPA, a penalized party still would not know what procedures a reviewing district court would provide before electing Option 2. Such uncertainty would create an unfair process for a party choosing Option 2, and a reading of the statute which allows for such uncertainty and unfairness is not sound.

The court reads Option 2 as calling for a trial *de novo* subject to the Federal Rules of Civil Procedure applicable in an ordinary civil action. *Cf. Califano v. Yamasaki*, 442 U.S. 682, 700 (1979) (holding Federal Rules apply in "the absence of a direct expression by Congress of its intent to depart from the usual course of trying 'all suits of a civil nature' under the Rules established for that purpose"); *United States v. First City Nat'l Bank of Houston*, 386 U.S. 361, 368 (1967) ("The words 'review' and 'trial' might conceivably be used interchangeably."). This will enable the court to

develop the facts needed to test the correctness of the penalty assessment, subject to the procedural protections and adversarial rights ordinarily attendant to a civil action, before entering an order affirming (or modifying, or setting aside) the assessment. But while the court believes this to be the better reading, the statutory language is at least somewhat ambiguous.

### B.    FERC's Prior Positions and Interpretations

Respondents argue FERC's position in this case is at odds with its statements in prior orders. In 1988, FERC issued an order in connection with the publication of final rules establishing procedures for assessing civil penalties under the FPA. *Procedures for the Assessment of Civil Penalties under Section 31 of the Federal Power Act*, 53 Fed. Reg. 32035-01 (1988). The order discusses a person's "right to make an election between the Commission's administrative procedures under [Option 1] and trial court procedures in United States District Court under [Option 2]." *Id.* at 32036. It then states that when "district court procedures are followed, the assessment of civil penal[ti]es by the Commission merely triggers the process leading to a *de novo* trial." *Id.* In 1994, FERC issued an order regarding the settlement of an enforcement case. *Consumers Power Co.*, 68 FERC 61077 (1994). In determining that the proposed settlement conflicted with the FPA, the order stated that Section 31 of the FPA requires "the opportunity for a hearing on the record before an Administrative Law Judge or a trial *de novo* in federal court." *Id.* at 61380. Even though decades old, these statements support a view that the statute calls for *de novo* trial under Option 2.

FERC argues its old orders cannot determine the procedures this court uses. Additionally, as FERC points out, the FPA was amended in 2005 to give FERC greater civil penalty authority. While the timing may be coincidental, FERC's more recent orders since this amendment generally refer to the broader concept of "*de novo* review" rather than the specific procedure of a "*de novo* trial." In 2006, FERC issued an order clarifying its penalty assessment policy with respect to a number of statutes. *Statement of Administrative Policy Regarding the Process for Assessing Civil Penalties*, 117 FERC

61317 (2006). Discussing the FPA, FERC simply reiterated the language of Option 2 stating that a district court is authorized "to review *de novo* the law and facts involved," so this pronouncement does not clarify the issue before the court. *Id.* ¶ 5

In 2007, FERC issued an order in an enforcement case entitled *Energy Transfer Partners, L.P.* 121 FERC 61282 (2007) ("2007 FERC Order"). The case did not involve FPA penalties, but the order compared the FPA with the Natural Gas Policy Act ("NGPA"), another statute FERC administers. Unlike the FPA, the NGPA does not give parties facing a penalty the right to elect the applicable procedures. Instead, the NGPA calls for a process that is substantially the same as FPA Option 2. After notifying a person of a proposed penalty for noncompliance with the NGPA, FERC "shall, by order, assess[] such penalty." 15 U.S.C. § 3414(b)(6)(E). If the penalty is not paid, the NGPA applies the exact same language found in FPA Option 2 regarding *de novo* review by the district court.[1] Like FPA Option 2, the language of the NGPA does not afford any right to respond or other procedural rights prior to district court review, although FERC has interpreted the statute to mean that, while it is not required "to follow any specific process," it has the discretion to "hold an administrative hearing if we believe it is appropriate." 2007 FERC Order ¶¶ 30-31.

The 2007 FERC Order frequently refers to "*de novo* review." *See, e.g., id.* ¶¶ 53-54. However, it also discusses the availability of "trial *de novo*" under the provision of the NGPA that is identical to FPA Option 2. Construing this provision, FERC stated "Congress created an affirmative right for the [penalized] person to receive review of the Commission's assessment in a trial *de novo* in district court." *Id.* ¶ 34. It later explained that the provisions of the Administrative Procedure Act ("APA") governing administrative adjudications do not apply to an NGPA penalty assessment "given that the

---

[1] The legislative history for the NGPA states "violators may obtain review of [FERC's penalty] assessment through a trial *de novo* in federal district court." H.R. Rep. No. 95-1752, at 121 (1978), reprinted in 1978 U.S.C.C.A.N. 8983, 9038. This is certainly not conclusive, but it does interpret language identical to that found in FPA Option 2 as requiring a trial.

recipient of the penalty has an affirmative right to receive review of the Commission's assessment in a trial *de novo* in district court." *Id.* ¶ 77. The NGPA language from which FERC draws the right to a "trial *de novo*" is identical to the language used in FPA Option 2, which implies contemplation of a trial under FPA Option 2. It is also relevant that neither the NGPA nor FPA Option 2 provides parties with procedural rights before district court review. *Cf. Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007) (it is a "standard principle of statutory construction" that "identical words and phrases within the same statute should normally be given the same meaning"). The FPA and the NGPA are not the same statute, but they are two major statutes administered by FERC and their use of the exact same language in analogous provisions supports interpreting those provisions to mean the same thing. Therefore, the court is inclined to apply FERC's view on trial *de novo* under the NGPA to the same language in the FPA.

### C.    The Approaches of Other Courts

The court is not aware of any case in which the parties contested the meaning of Option 2. In *Doe v. United States*, 821 F.2d 694 (D.C. Cir. 1987), the D.C. Circuit was confronted with the Privacy Act, a statute allowing individuals to bring civil actions in district court to challenge an agency's decision not to amend the individual's records on file with the agency. The statute provided that "[i]n such a case the court shall determine the matter *de novo*." *Id.* at 697. Interpreting this provision in the majority opinion, then-Judge Ginsburg held: "*De novo* means here, as it ordinarily does, a fresh, independent determination of 'the matter' at stake; the court's inquiry is not limited to or constricted by the administrative record, nor is any deference due the agency's conclusion." *Id.* at 697-98. In a footnote, however, Judge Ginsburg stated that "*de novo* review, in diverse contexts, does not entail any trial-type hearing." *Id.* at 698 n.10. "My dissenting colleagues comprehend *de novo* review in this case to necessitate trial in the district court," she wrote, "[b]ut if the court is to make anew the same judgment earlier made by the agency, and the Privacy Act concededly does not oblige

the agency to hold a hearing . . . then it is difficult to understand why a court must accord a first hearing to something the agency was not obliged to hear, and in fact did not hear." *Id.*

Taken in isolation, this language supports FERC's reading of Option 2. But *Doe* concerned a different statute that simply directed a court to "determine the matter *de novo*," and tying the amount of process given at the district court to the amount of process given by the agency would lead to an odd result in this case. If this approach were adopted, upon a party's election of Option 2, FERC could limit the amount of process at the district court by taking fewer facts and providing less explanation for its penalty assessment at the administrative level. This would be an unreasonable construction of the statute that would eviscerate a party's right to elect district court procedures and the district court's ability to conduct a *de novo* review. Additionally, even if *de novo* review does not always mean a trial, that does not resolve the question of whether it requires a trial in the context of the FPA and Option 2.

*MacDonald*, 862 F. Supp. at 667, is closest to being on point. It is the only decision the court is aware of discussing the meaning of *de novo* review under Option 2 in a situation similar to this case.[2] In *MacDonald*, FERC issued a notice of proposed penalty for violation of regulations and the defendant elected district court procedures under Option 2. The parties apparently did not dispute the procedures to be applied, however, and the opinion does not address the issue. Instead, the case proceeded as a normal civil action. The docket indicates the parties engaged in discovery, including the taking of depositions and judicial management of discovery disputes, before filing cross-motions for summary judgment. Ruling on the cross-motions for summary judgment, the court declared it "must make a *de novo* review of the assessment" and would "give no deference to FERC's decision."

_____

[2] In *Clifton Power Corp. v. FERC*, 88 F.3d 1258, 1263-64 (D.C. Cir. 1996), the D.C. Circuit reviewed the language of Option 2, but found that the penalized party could not elect Option 2 procedures because it had been charged with violating a final order.

*Id.* at 672. The *MacDonald* court stated that it would "make 'a fresh, independent determination of the matter at stake.'" *Id.* (quoting *Doe*, 821 F.2d at 697-98).

After narrowing the case by granting summary judgment on certain issues, the *MacDonald* court determined genuine issues of material fact remained with respect to other issues and partially denied the cross-motions for summary judgment. *Id.* at 676-77. According to the docket, the case was set for a bench trial before the parties settled. There is no real disagreement that the *de novo* standard of review under Option 2 requires this court to make a "fresh, independent determination" of the matter, and the dispute between FERC and Respondents centers on the procedures to be used in effecting that determination. The *MacDonald* court did not have occasion to address a dispute over the scope of the procedures to be used, but it is clear from the case's procedural posture that the parties engaged in discovery in advance of an anticipated trial, and the court infers that the Federal Rules of Civil Procedure were followed as in an ordinary civil action. Thus, *MacDonald* supports Respondents' reading of Option 2.

Two ongoing cases have grappled with the procedures to apply under Option 2, but neither has had the chance to resolve the issue as of the date of this decision. In *FERC v. Barclays Bank PLC*, 105 F. Supp. 3d 1121, 1128-29, 1148 (E.D. Cal. 2015), the defendants elected Option 2 procedures and filed a motion to dismiss FERC's petition, which the court denied. Since then, the *Barclays* court has been considering "whether the record already submitted . . . is sufficient for [the] Court's *de novo* review." *Id.*, Dkt. No. 133 at 2 (E.D. Cal. Dec. 18, 2015). It has not yet "conclusively determine[d] whether Defendants have the right to a jury trial or another means of fact-finding, to call witnesses, to offer evidence, to cross-examine FERC's witnesses, or have the right to discovery." *Id.*, 2016 WL 793999, at *4 (E.D. Cal. Mar. 1, 2016). In *FERC v. Silkman*, 2016 WL 1430009 (D. Mass. Apr. 11, 2016), a fellow judge in this district considered the meaning of Option 2. In the context of deciding that an argument had been waived because of failure to present it to FERC before filing suit, the

court opined that *de novo* review "may or may not require . . . trial-like proceedings." *Id.* at *9 n.5 (citing *Doe*, 821 F.2d at 697-98).

The *Barclays* court rejected the defendants' argument that the proceedings before FERC were deficient because they could not obtain evidence or seek discovery. The court noted the defendants were given and took advantage of multiple opportunities to respond to FERC's allegations with arguments and exhibits in their defense, and stated that it "does not find that the administrative process 'lacked the basic elements common to adversarial adjudication.'" 105 F. Supp. 3d at 1133 (citing *FEC v. Nat'l Republican Senatorial Comm.*, 877 F. Supp. 15, 17-20 (D.D.C. 1995)). The *Silkman* court agreed with this view, stating that, while "FERC's proceeding may have been less formal and offered fewer . . . procedural protections than some adjudications under the APA," FERC's action was "significantly more than a prosecutorial determination." 2016 WL 1430009, at *12. The *Barclays* court stated it "is not clear the information Defendants seek to discover is essential to its opposition, if FERC's position is accurate that Defendants' 'own trades, communications, testimony, and data analyses comprise nearly all the evidence in the administrative record.'" 2016 WL 793999, at *4.

It is similarly unclear in this case what relevant information Respondents could obtain through adversarial proceedings, but there is value inherent in an adversarial process. This is shown by the fact that Option 1 provides one and FERC claims to have provided one in this case. And even if FERC afforded Respondents some form of adversarial procedures in this case, that does not resolve the question of what the statute requires. In a different factual and statutory context, *Doe* contains language supporting FERC's reading of Option 2. *MacDonald* points the other way, appearing to side with Respondents in a factually analogous case, but it is not clear the issue was disputed in that instance. The courts in *Barclays* and *Silkman* have expressed doubts regarding parties' entitlement to all the elements of an ordinary civil action, but neither court has had the opportunity to render a final decision on that question and each court has discussed the possibility of additional

17

factfinding at the district court level. The approaches of other courts are not conclusive, but they do provide some support for the interpretation that Option 2 requires a *de novo* trial.

### D.    Due Process

Due process considerations complete the court's interpretation of the statute. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). The balancing test for determining whether existing procedures comport with due process weighs "the private interest that will be affected by the official action . . . the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards" and "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335.

Here, Respondents' private interest is strong, with Maxim facing a $5 million fine and Mr. Mitton facing a $50,000 fine in addition to reputational damage to both. The risk of erroneous deprivation, although perhaps not as strong as the private interest, is substantial. FERC's penalty assessment was decided by a 3-1 vote, and the dissenting Commissioner took the apparently unusual step of writing a dissent characterizing Respondents' actions as innocent decisions made for legitimate business reasons rather than willful market manipulation. While the court has no difficulty "presum[ing] that administrators are [people] of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances," *Brasslett v. Cota*, 761 F.2d 827, 837 (1st Cir. 1985), the simple fact that the Commissioners perform both investigatory and adjudicatory functions in the same case risks an inherent bias in the decisionmaking process, even if that bias is entirely unintentional and even if the "combination of functions does not alone violate due process." *Pathak v. Dep't of Veterans Affairs*, 274 F.3d 28, 33 (1st Cir. 2001). This is

compounded by the fact that, according to FERC, "the Commissioners and their staff need to be able to communicate freely with investigative staff on a wide range of topics" in order to perform their supervisory function properly during the investigative stage. (Dkt. No. 45, Ex. D.)

The probable value of additional adversarial procedures is high. FERC's prior actions and stated positions concede this point for all practical purposes. Since 2007, FERC has exercised its "discretion to extend greater protections, beyond what is required," and chosen to "provide additional due process" in Option 2 cases by allowing parties choosing Option 2 to file evidence and arguments responding to its penalty recommendations. 2007 FERC Order ¶¶ 88-89. Although FERC states these additional protections go beyond what "due process require[s]," it took these steps "in order to eliminate any perception of unfairness or prejudgment." *Id.* ¶ 88. Regardless of what due process requires at a minimum, it is clear that additional procedures exceeding the statutory requirements have value in Option 2 cases. The court understands that FERC provides more process than required in order to be fairer to penalized parties, and the court is sensitive to the fact that this decision is now being used against FERC by the very entities it was meant to help, but this does not diminish the fact that additional process is valuable to parties facing civil penalties. The question is whether the procedures provided by FERC in this case were sufficient, or if additional adversarial procedures are needed.

FERC consistently seeks to characterize the proceeding which took place before the penalty assessment as an "adversarial proceeding." (*See, e.g.,* FERC's Mem. on Procedures at 8 ("The procedures the Commission followed in the proceeding below were faithful to the language and purpose of the FPA, fair and impartial, and adversarial.").) The implication is that an adversarial proceeding is needed to satisfy due process, but the court is not persuaded the proceeding that actually took place was as adversarial as FERC claims. While Respondents were free to submit evidence and responsive arguments, they were unable to seek discovery, depose witnesses

interviewed by FERC, gain any insight into the presentation of the case made by FERC's enforcement staff to the Commissioners during the investigative phase, or present their own witnesses. It is true that Respondents were permitted to submit any materials they wished. And given FERC's representation that the penalty was based on communications involving Respondents, the universe of relevant additional information that Respondents could obtain and present through additional process is limited. But that is something for the court to address through its discretion to shape the procedures and discovery process in any ordinary civil action, and not a reason to preclude an ordinary civil action entirely.

The *Barclays* court did "not find that the administrative process 'lacked the basic elements common to adversarial adjudication.'" 105 F. Supp. 3d at 1133. But the *Barclays* defendants provided "no response to [FERC's] specific assertions" that they were able to submit their own evidence and arguments, *id.*, while Respondents here have indicated a desire to supplement those submissions with depositions of witnesses interviewed by FERC, presentation of their own witnesses, and other discovery. It is enough to say there is a high probable value of additional adversarial procedures.

On the other side of the *Mathews* scale, FERC's interest in efficient administration of penalties under Option 2 is strong. But that interest does not equate to denying Respondents process which they would have had if Option 1 had been elected. FERC is potentially burdened by additional procedures. To the extent Respondents seek to recreate procedures that already took place, FERC would be burdened by this duplication of efforts, which would be a serious concern if not addressed. But FERC concedes it was not required to offer the procedures it did, and the court has discretion to tailor discovery and otherwise manage the case in order to avoid any unnecessary duplication. *See, e.g., Crawford-El v. Britton*, 523 U.S. 574, 598 (1998) ("Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly."). This is especially true given the proportionality

considerations placed into Rule 26 by the 2015 amendments to the Federal Rules of Civil Procedure, which, as discussed below, the court finds should apply in this case.

FERC may also be prejudiced to the extent additional procedures inherently impose additional burdens, but in this manner it is no different than any other civil litigant. An adversarial process in general does not impose an excessive burden on FERC, as evidenced by the use of adversarial proceedings under Option 1 and FERC's insistence that the procedures followed in this case were adversarial. In addition to the focus on proportionality in discovery embodied in amended Rule 26, the court has discretion to set further limits on discovery in order to minimize the burdens on the parties and promote an efficient resolution of the case. FERC's interests under the *Mathews* balancing test are strong, but because the court is able to protect those interests by tailoring and managing the discovery process, they are outweighed by Respondents' interests. The court therefore finds the *Mathews* scale tips in favor of holding an ordinary civil action with a *de novo* trial, subject to proper limitations on discovery that take proportionality into account.

"The fundamental requirement of due process" identified by *Mathews*—"the opportunity to be heard at a meaningful time and in a meaningful manner"—underscores that Respondents must be given a meaningful choice between two options that each secure their due process rights. 424 U.S. at 333. FERC argues Respondents' reading would render FERC proceedings undertaken before district court review a "meaningless" and "pointless exercise" (*see* FERC's Mem. on Procedures at 23), but FERC has admitted the FPA does not require such proceedings under Option 2. If anything, by directing FERC to "promptly assess" penalties under Option 2, the statute tells FERC not to spend time on proceedings prior to assessing the penalty. There must be due process rights and factfinding at some level, but by directing FERC to promptly assess a penalty and institute an action in district court if the penalty is not paid, the statute indicates that due process and factfinding take place at the district court under Option 2. Because Option 2 does not provide Respondents

with any procedural rights at the administrative level, in order to comport with due process, it must provide those rights at the district court stage instead.

The court wishes to stress that it understands FERC granted additional procedures out of a sense of fairness toward parties facing penalties. FERC's willingness to be flexible and provide additional procedures at its own discretion is laudable. The court presumes FERC acted conscientiously during the penalty assessment, but FERC's decisionmaking process must nevertheless be able to stand up to district court review. The court's reading of the statutory language, bolstered by FERC's prior pronouncements, the approaches of other courts, and the requirements of due process, leads the court to conclude that Option 2's *de novo* review means treating this case as an ordinary civil action governed by the Federal Rules of Civil Procedure that culminates, if necessary, in a jury trial.

## IV.    RESPONDENTS' MOTION TO DISMISS

Turning to the substance of the case, FERC makes two claims for relief based on Respondents' alleged market manipulation and lack of candor in communications with ISO-NE. FERC's first claim alleges that, in violation of 16 U.S.C. § 824v and 18 C.F.R. § 1c.2, "Maxim and Mitton engaged in a fraudulent scheme, which relied on deception of [ISO-NE], to obtain payments at high fuel oil prices for reliability dispatches when Maxim actually produced the energy using much less expensive natural gas." (Pet. ¶ 71.) FERC's second claim alleges that, in violation of 18 C.F.R. § 35.41(b), "Maxim made false and misleading statements to [ISO-NE], and omitted material information in communications with [ISO-NE], concerning the operation of the Pittsfield plant in July and August 2010. Maxim did not exercise due diligence to prevent these misleading statements or to avoid these material omissions." (*Id.* ¶ 74.)

To survive a Rule 12(b)(6) motion to dismiss, FERC's petition must allege facts that "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus,

the factual allegations in the petition must "nudge[] [the] claims across the line from conceivable to plausible." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In assessing a claim's plausibility, the court must construe the petition in FERC's favor, accept all non-conclusory allegations as true, and draw any reasonable inferences in favor of FERC. *See San Gerónimo Caribe Project, Inc. v. Acevedo-Vilá*, 687 F.3d 465, 471 (1st Cir. 2012).

Respondents raise a general argument that FERC has failed to meet Federal Rule of Civil Procedure 9(b)'s heightened pleading requirements for fraud allegations. Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." FERC argues the Federal Rules do not apply to this action. Because the court finds this case is to be treated as an ordinary civil action (with limits on discovery), the Federal Rules do apply, but FERC nevertheless easily meets the requirements of Rule 9(b). FERC has provided detailed factual allegations that identify and quote Respondents' allegedly misleading communications and material omissions. (*See* Pet. ¶¶ 37-51.) FERC explains why it sees Respondents' statements and omissions as misleading, and Respondents are fully aware of FERC's position and able to respond to it.

Respondents also argue FERC has failed to plead a misrepresentation or actionable omission of material fact. "[C]ontext is important in evaluating whether a party has made a material misstatement or omission." *Baron v. Smith*, 285 F. Supp. 2d 96, 102 (D. Mass. 2003). Respondents assert the context shows ISO-NE was simply asking about offer prices throughout July 2010 and that Respondents replied accordingly, but FERC plausibly alleges the context shows Respondents were trying to conceal the fact that Maxim was burning natural gas while offering on oil prices. For example, while ISO-NE's initial voicemail to Mr. Mitton did ask about offer prices, FERC asserts the context shows ISO-NE's concern with fuel being burned. Moreover, FERC contends that, by

drawing attention to the TGP restrictions, Mr. Mitton drew attention away from (and omitted material information regarding) the fact that the Pittsfield plant was burning natural gas while being paid based on oil prices. This goes far beyond the "mere[] . . . 'fostering' of 'impressions'" found inadequate to plead misrepresentations in *Baron. Id.* at 101. Additionally, "some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead." *Mass. Mut. Life Ins. Co. v. DB Structured Prods., Inc.*, 2015 WL 3964560, at *10 (D. Mass. June 19, 2015) (quoting *Lucia v. Prospect St. High Income Portfolio, Inc.*, 36 F.3d 170, 175 (1st Cir. 1994)). FERC alleges precisely this sort of literally accurate but still misleading statement when it asserts Respondents mentioned real pipeline restrictions in an attempt to hide the fact that Maxim was able to obtain and burn natural gas while being paid based on oil prices.

According to Respondents, there was no duty to disclose the fuel burn data until they were asked to do so on August 16, 2010. Additionally, Respondents point out there was no rule in 2010 against making an offer based on the price of one fuel and then burning another. FERC counters that statements can be deceptive if they omit facts necessary to prevent them from communicating an untrue message, and FERC's anti-manipulation rule makes it unlawful "to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 18 C.F.R. § 1c.2(a)(2). FERC alleges Respondents omitted facts necessary to make their statements not misleading. According to FERC, Respondents crafted responses to imply Maxim was offering on oil because of gas restrictions, but did not reveal it was getting "nearly all" the gas it needed, and on some days had even contracted for the gas before offering on oil. FERC also asserts that, in June 2010, Maxim offered on gas even during pipeline restrictions, suggesting that Maxim did not always offer on oil for risk management as Respondents have indicated. Additionally, FERC's allegations show that Respondents opened the door to consideration of pipeline restrictions and Maxim's economics and risk management. Respondents

argue FERC must show their statements were rendered false by failing to disclose fuel burn data, and FERC has alleged exactly that. Finally, FERC's candor rule requires candor in all communications with entities like ISO-NE, and it has no scienter requirement. Whether FERC can ultimately prove its case remains to be seen, but under these legal principles, its allegations are certainly enough to survive a motion to dismiss.

Many of Respondents' other arguments boil down to refuting FERC's allegations of fraud and misrepresentation or omission of material facts, and they fail for the reasons discussed above. Taking FERC's allegations to be true at this stage, it has plausibly alleged particularized facts showing Respondents planned to defraud ISO-NE. Attempting to characterize their actions as being taken for legitimate economic reasons, Respondents assert there were days when they did not obtain sufficient gas from TGP, but FERC's countervailing allegations that Respondents procured gas before offering on oil and sometimes offered on gas during pipeline restrictions overcome this defense at the motion to dismiss stage. And, contrary to Respondents' arguments, FERC's allegations adequately plead fraudulent intent. In addition to the claims addressing the alleged overall scheme, for example, FERC points to an internal Maxim email saying Maxim had to provide "the rationalization behind our pricing" as evidence of fraudulent intent and a plan to deflect scrutiny from ISO-NE that would otherwise lead to mitigation.

Respondents also contend FERC fails to plead a fraudulent scheme under FERC Rule 1c.2(a)(1) or engaging in an act that operates as a fraud under FERC Rule 1c.2(a)(3), because any claims of a fraudulent scheme are duplicative of claims for alleged misrepresentations or omissions. FERC Rule 1c.2(a)(1) is based on SEC Rule 10b-5(a) and FERC Rule 1c.2(a)(3) is the analogue of SEC Rule 10b-5(c). *See* 17 C.F.R. § 240.10b–5; 18 C.F.R. § 1c.2. Courts have found that "conduct that could become deceptive only through misleading statements . . . does not create liability under subsections (a) and (c) of Rule 10b-5," but is instead duplicative of a claim for alleged

misrepresentations or omissions under Rule 10b-5(b), the analogue of FERC Rule 1c.2(a)(2). *Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175, 211-12 (D. Conn. 2014). The court agrees with FERC that it alleges a fraudulent scheme and acts of fraud separate from the alleged misrepresentations and omissions. According to FERC, in addition to their misrepresentations and omissions, Respondents' scheme consisted of a pattern of fraudulent conduct, including acquiring natural gas before making offers on oil prices. Construing the petition in the light most favorable to FERC, this is sufficient to allege a fraudulent scheme and acts of fraud under FERC Rules 1c.2(a)(1) and 1c.2(a)(3).

Respondents invoke the "fair notice doctrine," under which a defendant "may not be punished" for conduct without fair notice it violated an agency's interpretation of a rule. *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1333-34 (D.C. Cir. 1995). Respondents argue they had no notice of a penalty for offering on one fuel and burning another or for failing to provide fuel burn data before they were asked for it. FERC argues that this misrepresents the allegations, and that Respondents engaged in a manipulative scheme and misled ISO-NE. Reading the petition in FERC's favor, the court agrees that FERC is not merely alleging that Respondents offered on one fuel and burned another, but that Respondents planned to do so and mislead ISO-NE about it to collect a windfall. The alleged violation is based on planning the scheme and attempting to lull ISO-NE into not investigating further. Similarly, FERC is not alleging Respondents breached a free-standing obligation to disclose fuel being burned, but that they were obligated to do so in this case to ensure their statements were not misleading. Thus, there is no violation of the fair notice doctrine. Additionally, FERC's failure to distinguish among the various Maxim entities in the petition is immaterial. The Maxim entities are one business concern insofar as they operate the Pittsfield plant and FERC's allegations appropriately treat them as such.

Respondents also argue FERC fails to adequately plead materiality, because the $2.99 million overpayment was ultimately retained by ISO-NE and not kept by Maxim. There is some confusion

over whether or not Maxim ever received some or all of this money and had to pay it back, but the parties' filings suggest Maxim was paid the $2.99 million and had the payment mitigated by ISO-NE. (*See, e.g.,* Dkt. No. 24, FERC's Mem. Opp. Mot. to Dismiss at 23 n.28; *but see* Dkt. No. 29, Respondents' Reply Mem. Supp. Mot. to Dismiss at 10 n.6.) Whether the payments were mitigated or never made in the first place, FERC argues the alleged fraudulent actions were material even though Maxim did not keep the money, and the court agrees. Materiality concerns whether Respondents' alleged conduct would have resulted in illegitimate payments from ISO-NE by "omit[ing] information [that] would have significantly altered the total mix of information" available to ISO-NE, not whether the alleged plan ultimately worked. *In re Praecis Pharms., Inc. Sec. Litig.*, 2007 WL 951695, at *18 (D. Mass. Mar. 28, 2007). The alleged conduct meets this standard of materiality. So long as it was material, attempted market manipulation is as actionable as completed market manipulation. *Cf. Kuehnert v. Texstar Corp.*, 412 F.2d 700, 704 (5th Cir. 1969) ("[W]e are not convinced of any difference in substance between a successful fraud and an attempt."). The fact that ISO-NE could review public materials to verify Respondents' statements does not mean it always did, especially given FERC's allegation that Respondents were trying to prevent exactly that. If FERC's allegations are true, giving Respondents a free pass because they were caught would defeat the purpose of the anti-manipulation and candor rules.

Finally, Respondents assert the claims against Mr. Mitton should be dismissed because FERC has no authority to issue a penalty against an individual. Although this is a close question, the court disagrees. Section 222(a) of the FPA makes it unlawful for any "entity" to engage in market manipulation. 16 U.S.C. § 824v(a). "'[E]ntity' typically refers to an organization, rather than an individual," *Samantar v. Yousuf*, 560 U.S. 305, 315 (2010), but its meaning is not so clear-cut in this case, especially because the term may also "include a natural person," *City of Abilene v. FCC*, 164 F.3d 49, 52 (D.C. Cir. 1999), and both sides have proffered dictionary definitions with differing

interpretations, some of which include natural persons. Section 222(a) of the FPA is modeled on Section 10(b) of the Securities Exchange Act of 1934 and the statutes are virtually identical, except that Section 222(a) prohibits fraud by any "entity" while Section 10(b) proscribes fraud by any "person." *See* 15 U.S.C. § 78j(b); 16 U.S.C. § 824v(a). Respondents have a strong argument that the use of different terms means Congress intended for the FPA not to cover natural persons. *Cf. Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006) ("We normally presume that, where words differ as they differ here, Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

But "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme," *Roberts v. Sea-Land Servs., Inc.*, 132 S. Ct. 1350, 1357 (2012), especially when a particular term is susceptible of different meanings. The structure and purpose of the FPA's statutory scheme lead to the conclusion that Section 222(a) covers natural persons. FPA Section 316A provides that "[i]t shall be unlawful for any person to violate any provision" of FPA Part II "or any rule or order issued under any such provision," which includes the anti-manipulation rule and the candor rule. 16 U.S.C. § 825o-1(a). Another provision in FPA Part II allows enforcement against natural persons and use the term "person" interchangeably with "entity." *See* 16 U.S.C. § 824u ("No entity . . . shall willfully and knowingly report any information relating to the price of electricity sold at wholesale or the availability of transmission capacity, which information the person or any other entity knew to be false at the time of the reporting."). Given the context of these other provisions and the fact that FPA Section 222 was enacted as part of the Energy Policy Act of 2005, which enhanced FERC's civil penalty authority, it would be incongruous to read the statute as allowing enforcement against business entities engaging in market manipulation but precluding enforcement against the individuals who actually carry out the manipulative schemes. The *Barclays* court arrived at this conclusion after careful analysis, 105 F. Supp. 3d at 1146, and the *Silkman* court

agreed that "the term 'entity' in this statutory context appears best read to include individuals." 2016 WL 1430009, at *20. These are the only two decisions on this subject of which this court is aware.

More importantly, FERC's final rule interpreting FPA Section 222 "interprets 'any entity' to include any person or form of organization, regardless of its legal status, function or activities." *Prohibition of Energy Market Manipulation*, 114 FERC 61047 ¶ 18 (2006). That interpretation deserves *Chevron* deference. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). The *Chevron* framework applies to an agency's statutory interpretation "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001). Congress specifically authorized FERC to make "rules and regulations" under Section 222, *see* 16 U.S.C. § 824v(a), and the final rule was promulgated in exercise of FERC's delegated authority. *See Silkman*, 2016 WL 1430009, at *21 ("[FERC's] interpretation . . . was put forward as part of the notice-and-comment process, in precisely the same Commission order as the text itself. This interpretation was made 'in the exercise' of notice-and-comment rulemaking . . . . *Chevron* governs the interpretation of this provision."). Because FPA Section 222 is "ambiguous with respect to the specific issue" of whether it applies to natural persons, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. The court finds FERC's determination to be based on a permissible construction of the statute, and it therefore "may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* at 844. FPA Section 222 applies to individuals such as Mr. Mitton.

## V.    PROCEDURAL GUIDELINES

While this case will proceed as an ordinary civil action, discovery must be tailored in order to account for the procedures that have already taken place and promote an efficient resolution of the

dispute. The parties themselves are the best sources to articulate a discovery framework under the mechanism of Rule 26. The court briefly sets forth the following guidelines the parties shall follow in proposing a discovery plan. The 2015 amendments to the Federal Rules of Civil Procedure, including Rule 26, shall apply to this case, which was already pending at the time of the amendments, as the court finds their application to be "just and practicable" in accordance with the Supreme Court's order dated April 29, 2015. Therefore, the parties are directed to account for the proportionality considerations embodied in amended Rule 26(b)(1) when formulating the discovery plan.

Overall, the discovery plan must balance Respondents' (and the court's) need for information about FERC's investigation with the need for efficient penalty administration that is not bogged down at the discovery stage. The parties shall develop a discovery plan that effectuates this while avoiding duplication of any efforts that already took place. Because Respondents were permitted to send FERC anything they wanted and extensive materials were reviewed prior to the penalty assessment, discovery must be tailored to avoid replicating these efforts or targeting anything that has already been submitted or reviewed. At the same time, even though Respondents had ample opportunity to submit materials to FERC, it would not be fair or conducive to *de novo* review to limit the factual record to the materials FERC wants the court to see. Respondents were not allowed to seek discovery from witnesses interviewed by FERC or present their own witnesses, so they must be afforded a fair opportunity to do so. Respondents deserve some insight into how the case was presented by FERC's enforcement staff to the Commissioners during the investigative phase, but they may not use this opportunity to place an undue burden on FERC's staff or FERC's normal processes, and they must consider the application of amended Rule 26 in this regard.

With these principles in mind, the parties are directed to develop a discovery plan pursuant to amended Rule 26 for submission to the court for approval.

## VI.    CONCLUSION

Respondents' motion to dismiss (Dkt. No. 16) is DENIED in its entirety. The court finds this case is to be treated as an ordinary civil action subject to the Federal Rules of Civil Procedure, as amended in 2015, with discovery tailored to foster an efficient resolution of the case. The parties are directed to develop a discovery plan for the court's approval pursuant to amended Rule 26 that accounts for proportionality considerations and balances Respondents' legitimate need for appropriate discovery with the goals of avoiding duplicative efforts and promoting an efficient resolution of the case. The case shall be referred to Magistrate Judge Katherine A. Robertson for full pretrial case management.

It is So Ordered.

  _/s/ Mark G. Mastroianni_____
MARK G. MASTROIANNI
United States District Judge